IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF/RESPONDENT

v.                       Civil No. 04-5291
                         Criminal No. 02-50051-002

MARIO FLAMENCO                                              DEFENDANT/MOVANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Mario Flamenco, a federal prisoner, brings this motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. He is represented by retained counsel Joel Huggins. An evidentiary hearing was conducted on December 6, 2005. Witnesses were Flamenco, his daughter Sandra Flamenco, and Assistant United States Attorney Kenny Elser.

DISCUSSION

In September 2002, Flamenco and co-defendant Sebastian Gutierrez were indicted by a grand jury for conspiracy to distribute methamphetamine (Count I) and possession with intent to distribute more than 50 grams of a mixture or substance containing a detectable amount of methamphetamine (Count II). Flamenco was represented by attorney Larry Froelich.

In November 2002, Gutierrez pled guilty to Count II pursuant to a plea agreement whereby he would testify against Flamenco. At the jury trial in December 2002, Flamenco was found guilty on both counts. In April 2003, he was sentenced at the bottom of the Guideline range to 121 months on each count with the sentences to run concurrently.

Flamenco appealed, represented by attorney Joel Huggins. Huggins filed an *Anders* brief, finding no nonfrivolous issues for appeal. On February 5, 2004, the Eighth Circuit issued an unpublished opinion affirming Flamenco's conviction and sentence. After an independent review, the Eighth Circuit agreed there were no nonfrivolous issues. *United States v. Flamenco*, 87 Fed. Appx. 8, 2004 WL 212547 (8th Cir. 2004).

In the instant motion, Flamenco makes claims of ineffective assistance of counsel against attorney Froelich and challenges his sentence based on *Blakely v. Washington*. I discuss the claims in turn.

*Ineffective Assistance of Counsel*

To establish a claim of ineffective assistance of counsel, a movant must satisfy the two part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A movant must first show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, at 687. A movant must next show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, at 694.

*1. Withdrawal of Motion to Suppress*

Flamenco was arrested on August 12, 2002, by DEA task force officers conducting an undercover investigation into narcotics trafficking. After arrest, Flamenco verbally admitted to DEA agent Larry Roberts that he was involved in a drug deal with Gutierrez and gave a written confession stating he was doing "this dirty business to see if I could make some extra money." (Govt's Ex. 1).

In the confession, he admitted setting up the drug deal in which Gutierrez participated for $800 and said he intended to set up more sales.

Flamenco filed a motion to suppress the incriminating statements on the ground they were not voluntary. Prior to trial, Flamenco withdrew the motion, opting to allow the jury to consider the weight to be given the confession. (Trial T. 114, 269). Flamenco claims here that Froelich's advice to withdraw the motion amounted to ineffective assistance of counsel.

The government's trial evidence was that Gutierrez, who worked for Flamenco at Caco's Garage in Springdale, Arkansas, had discussions with a police informant concerning the purchase of drugs. Officers set up surveillance on Gutierrez at home and work. On August 12, 2002, Gutierrez struck a deal with the informant to sell him a pound of methamphetamine for $11,000 in the Harp's Shopping Center parking lot in Springdale. Officers were present at the scene. When the informant gave the bust signal, officers arrested Gutierrez and found the pound of methamphetamine in his vehicle. The drugs were packaged in a man's sock secured with black tape and wrapped in a red shop towel. One DEA officer at the scene, Scott Oringderff, observed a red Nissan Maxima parked in the direction of the drug bust. As Gutierrez's arrest was taking place, the driver of the Maxima moved the vehicle to another location in the same shopping center. Oringderff stopped the vehicle driven by Flamenco and placed him under arrest.

Flamenco was given *Miranda* warnings in the parking lot area and taken to the police headquarters. He denied drug activity and consented to a search of his vehicle, shop, and residence. Items found inside the Maxima – rolls of black tape and a red towel – were similar to those used to package the methamphetamine. Officers, with Flamenco in tow, went to Flamenco's residence to conduct a search. Present at the home were Flamenco's 12-year-old daughter Sandra and relatives

Ricardo Sanabria and his wife Marta who lived at the residence. DEA agent Larry Roberts spoke to Flamenco and the others in Spanish. After the search was completed, Flamenco admitted to Roberts that he supplied the drugs to Gutierrez. Flamenco was taken to the police station, again given *Miranda* warnings, and signed a written confession. (*See* Govt's Ex. 7, Report of Investigation).

Flamenco, Sandra, Ricardo, and Marta gave trial testimony that Roberts was threatening and overbearing during the search. Their collective testimony was three officers entered while others remained outside. Once inside, Roberts, the only officer who spoke Spanish, became rude and made threatening remarks and screamed at Flamenco. He told Sandra that Flamenco would rot in jail for 10 years and be raped by black men. He called Flamenco names like "dog" and "bastard." He told Flamenco he would never see his family again and they were also in danger. Sandra cried a great deal and the others were upset by Roberts' language. The other officers behaved politely.

Flamenco further testified at trial that because of some experiences in El Salvador in the 1970's when police killed citizens, he has a fear of policemen and strongly reacted to Roberts' language and thought Roberts would harm him and he would never see his family again. He gave the incriminating statements because he thought the police would kill him if he did not cooperate and this was his "only chance" and "opportunity" to cooperate. Later at the police station, he wrote down only that he had done some business that was wrong, then Roberts told him the details to put into the confession. Flamenco denied ever being involved in drug activity.

On cross-examination, Flamenco, 47 years old at the time, admitted he had been in the United States for 16 or 17 years prior to the incident and runs a business. He said that when he first talked to officers at the parking lot, he denied involvement. He conceded that he was given his

Miranda rights by Roberts prior to giving his oral statements and was again advised of the rights at the police station prior to writing his confession. He said Roberts threatened at the search scene that he better tell the truth.

Sebastian Gutierrez testified at trial to some officer abuse, also. According to Flamenco, when he was arrested after the drug bust, the officers threw him to the ground and handcuffed him, then yelled and screamed at him. One officer who spoke Spanish kept kicking him in the head and asking him where the drugs were until he lost consciousness. When he awoke, he was at the Springdale Police Department where officers asked him continual questions. He did not confess at that time, however, making his deal with the government closer to trial.

In his trial testimony, Roberts denied any abusive and threatening behavior toward Flamenco or his family. Roberts testified that after the arrest, he advised Flamenco of his *Miranda* rights and Flamenco initialed that he understood each right. When Roberts initially asked Flamenco if he was involved with the delivery of methamphetamine, he responded "no." When he and the other officers entered the residence with Flamenco to conduct the search, Sandra began crying when she saw her father in handcuffs. Roberts advised those present that Flamenco was under arrest for possession with intent to distribute methamphetamine and conspiracy to distribute methamphetamine. He told Flamenco's daughter that her father was a drug trafficker and it was likely she would not see him for 10 years. Roberts denied telling Sandra that her father would be sodomized by black men, maintaining that he would never say that to a 12-year old girl. Roberts denied making any threats or promises. Roberts recalled that as he and Flamenco exited the house and went toward the vehicle, Flamenco asked what Roberts could do for him if Flamenco knew some big drug traffickers. Flamenco then admitted his involvement in the drug activity.

At the evidentiary hearing, Froelich testified he believed the version of facts given by Flamenco and his witnesses concerning the conduct of Roberts at the search scene. Froelich said he withdrew the motion to suppress because he expected the judge to deny the motion and he did not want to present the testimony of Flamenco and Sandra more than once. Since Flamenco was persistent in declaring his innocence and planned to testify at trial, Froelich felt there was some advantage in presenting the testimony only one time. Froelich also assumed the confession would come in anyway on cross-examination even if suppressed but admitted this assumption could have been wrong. He conceded that if the confession had been suppressed the government's case would have been seriously weakened and "possibly" the trial strategy of having Flamenco testify might have changed.

For Flamenco to have prevailed on his motion to suppress statements, the district court would have had to find that this was one of those "rare cases" in which a defendant's self-incriminating statement was nevertheless "compelled" by threats, violence, or direct or implied promises despite the fact he received *Miranda* warnings. *See U.S. v. Astello*, 241 F.3d 965, 966-67 (8th Cir. 2001). I do not think the court would have so found.

Flamenco was advised by Roberts of his *Miranda* rights immediately after arrest which was prior to his oral statements at the residence. After his oral statements, Flamenco was again *mirandized* at the police station prior to giving his written statement. His testimony that the confession was due to continuing fears from events in El Salvador in the 1970's and that he thought he would be killed unless he gave a false confession appears self-serving and suspect. Although Roberts' behavior was likely quite rude, I find that the district judge would not have found the self-incriminating statements to have been compelled and would have denied the motion to suppress.

As such, Flamenco cannot show prejudice from withdrawal of the motion to suppress which is required to prevail on an ineffective assistance of counsel claim.

### 2. Failure to Challenge Probable Cause to Arrest

Flamenco contends that because his arrest was not supported by probable cause, the evidence garnered after his arrest should have been suppressed. He claims that his attorney should have but failed to file a motion to suppress on this ground.

Gutierrez was arrested by DEA agent Scott Oringderff. The government's trial evidence was that when Oringderff entered the Harp's Shopping Center parking lot, the arrest of Gutierrez was taking place. Oringderff observed a red Nissan Maxima 40 to 50 yards away from the arrest site facing in that direction. Oringderff had earlier observed the same vehicle during surveillance at Caco's garage and Gutierrez's apartment. He knew it was not uncommon for people with an interest in a drug transaction to be in the area and he believed the person driving the Maxima was involved. He observed the vehicle's lights come on and the vehicle move to another area of the parking lot in front of La Salvadoria grocery store. Oringderff stopped the vehicle, driven by Flamenco. Later, during a search of Flamenco's vehicle, rolls of black tape and a red towel were located which were similar to those used to package the methamphetamine found in Gutierrez's vehicle.

Flamenco presented evidence to show that he knew nothing of the drug sale that occurred between Gutierrez and the informant. Rather, it was a coincidence that he happened to be in the parking lot at the same time of the drug deal. He was there to shop at La Salvadoria, a store he frequents.

"Probable cause to arrest exists if the facts and circumstances known to an officer would warrant a person of reasonable caution in believing that the suspect has, is, or will soon, commit an

offense." *United States v. McKay*, 431 F.3d 185, 189 (8th Cir. 2005) (citing *United States v. Brown*, 49 F.3d 1236, 1348-49 (8th Cir. 1995).

Here, the facts and circumstances presented while Oringderff was at the parking lot were sufficient to warrant a person of reasonable caution to believe that the driver of the red Nissan Maxima, previously surveilled at Gutierrez's place of employment and residence, was keeping watch over the drug deal between Gutierrez and the confidential source and was therefore implicated in the illegal transaction. Further, during the search of the vehicle which belonged to Flamenco, items were found which were very similar to those use to contain the methamphetamine.

*3. Failure to Develop Trial Strategy*

Flamenco claims that his attorney failed to develop a reasonable trial strategy. Flamenco states that the government's case was built mainly on his incriminating statements, the testimony of Gutierrez who had agreed to testify in exchange for assistance in avoiding deportation, and the testimony of law enforcement officers who stated that hundreds of pounds of methamphetamine moved through Caco's Garage where police dogs alerted to several vehicles. Flamenco argues that Froelich failed to call witnesses to dispute that Flamenco was the owner of the garage, failed to call the dog handler to discuss the dogs alerting or not alerting to vehicles, and failed to cross-examine the crime lab expert or the arresting officer Scott Oringderff.

Flamenco claims that his attorney's failure to develop a trial strategy is shown by the lack of pretrial motions; lack of guidance in opening and closing statement regarding a viable defense theory, the elements and burden of proof, presumption of innocence, and requisite mental state; the failure to cross-examine government witnesses within the context of a specific defense theory or to

cross-examine at all the government's crime lab expert or the arresting officer; and, the failure to prepare defense witnesses to substantiate a viable alibi defense.

The trial transcript reveals that Froelich executed and presented a defense strategy at trial to show that Flamenco did not commit the crime of which he was accused. The government's evidence against Flamenco – Flamenco's confession, the testimony of Gutierrez, and the items found in Flamenco's vehicle – was very strong. To combat the confession, Froelich presented the testimony of Flamenco and family members present during the search to show that Flamenco had a fear of police officers based on experiences in El Salvador and that the overbearing and otherwise egregious conduct of DEA agent Roberts forced Flamenco to make false confessions because he feared for his life. Family members also testified that Flamenco was a clean-living family man who had never been in trouble. Further, testimony was elicited from Flamenco and the owner of the grocery store El Salvadoria to show that Flamenco was at the drug scene coincidentally and was actually there to shop for groceries at a store he often frequented. To overcome the testimony of Gutierrez, Froelich presented witnesses or elicited responses during cross-examination to show that Gutierrez and Flamenco did not get along and Gutierrez was falsely accusing Flamenco for personal revenge and also to strike a deal with the government to avoid deportation. Regarding the items found in Flamenco's vehicle, Froelich through cross-examination brought out differences in the items and those used to package the methamphetamine. In addition, Froelich attempted to rebut the government's evidence regarding Flamenco's ownership of Caco's garage by presenting evidence that Flamenco's involvement with Caco's was limited.

The docket sheet demonstrates that Froelich filed pretrial motions. The trial transcript shows that he vigorously cross-examined several government witnesses, made objections during trial, gave

lengthy opening and closing statements, introduced exhibits, and called several witnesses. Flamenco has not shown that Froelich failed to present evidence, ask questions, or take other action that would have created a reasonable doubt with respect to guilt. As such, there is no showing of ineffective assistance of counsel.

    *4. Failure to Move for Judgment of Acquittal*

Flamenco claims that Froelich failed to move for judgment of acquittal at the conclusion of the government's case. At the evidentiary hearing, Froelich admitted he erred in the matter, meaning that Flamenco could not appeal a denial of the motion.

> The issue on a motion for judgment of acquittal is whether the evidence at trial was "sufficient to support a conviction." *Kenyon*, 3897 F.3d at 1076. In considering whether the evidence is sufficient to sustain [a] conviction we view the evidence "in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict" and will only reverse the conviction if we find that "no reasonable jury" could have found him guilty. *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003).

*United States v. Peneaux*, 432 F.3d 882, 889-90 (8th Cir. 2005).

Here, the evidence presented by the government was sufficient to support the conviction and no prejudice is shown from Froelich's failure to move for judgment of acquittal. The government's evidence included the testimony of officers that Flamenco's car had been previously identified as being associated with Gutierrez, that Flamenco drove his car to the site of the drug deal and observed the drug bust, and that inside Flamenco's car were located items that were similar to those used to wrap the methamphetamine. Also, Gutierrez testified that Flamenco was the supplier of the methamphetamine and Flamenco's incriminating statements admitting to the drug activity were introduced into evidence.

### 5. *Failure to Produce Evidence Promised in Opening Statement*

Flamenco next contends that Froelich provided ineffective assistance when he failed to present evidence touted in the opening statement. In his motion, Flamenco specifies that Froelich promised to present evidence to explain away the government's two key pieces of evidence - Gutierrez's testimony and Flamenco's confession - but failed to do so. However, this is not borne out by the record. Froelich presented witnesses who provided a reason why Gutierrez would falsely testify against Flamenco – revenge and concessions from the government. Froelich also presented several witnesses to establish that Flamenco's confession was not true and was given only because of fear and officer misconduct. Although Flamenco may argue with the effectiveness of the evidence presented by Froelich, the attorney worked with what he had and I find no ineffective assistance of counsel in the matter.

### 6. *Failure to Prepare Sandra Flamenco*

Flamenco contends that his daughter Sandra was not properly prepared by attorney Froelich to testify about the conduct of DEA agent Roberts during the search of the family residence. At the evidentiary hearing, Sandra testified that prior to trial she wrote out a statement of events but Froelich never explained what would happen at trial or prepared her for her testimony. On the other hand, Froelich recalled that he did work with Sandra before trial, her testimony was articulate and collected, and he was stunned when she froze up at trial.

At trial, Sandra testified that Roberts was threatening and rude to her father and told her that her father would be in jail 10 years and would be "screwed" by other inmates. She did not testify, despite persistent efforts by Froelich, that Roberts told her the sexual attacks would be by "black men" and Judge Hendren admonished Froelich about impermissibly leading Sandra in trying to elicit

this testimony. Judge Hendren allowed Froelich out of the hearing of the jury to try to properly elicit the testimony. When Sandra refused to say "black men," Froelich whispered the words to her. Judge Hendren heard the aside, and Sandra was not called back before the jury. However, Roberto Sanabria and his wife Marta provided basically the same testimony as Sandra regarding Roberts' comments and conduct during the search and they also stated that Roberts told Sandra her father would be sodomized by "black men."

I found credible at trial Froelich's testimony that he worked with Sandra on her testimony before trial and was surprised when she lost her composure while on the stand. Moreover, the "black men" comment by Roberts was before the jury in other testimony and Sandra's failure to relate the comment did not prejudice the outcome of the proceedings

### 7. *Failure to Prepare for Defense Case-in-Chief*

Flamenco asserts that Froelich was ineffective when he failed to be ready to present the defense case when the government rested its case at 1:49 p.m. on the second day of trial which was a Tuesday. After the government rested, Judge Hendren stated he understood that the defense was "probably not prepared to put witnesses on at this point," to which Froelich responded, "Yes, your Honor. If we could be ready to go Thursday morning? And I'd also like, as far as my opening statement, I could probably do it a lot faster Thursday morning." (Trial T. 133). The district court advised the jury they were not to report the next day, which was Wednesday, but were to report on Thursday morning at 8:30 a.m. for continuation of the trial.

Flamenco argues that Froelich's admission that the defense side was not ready to proceed amounted to ineffective assistance of counsel. I disagree. Although it would have been preferable for the defense side to proceed after the government rested, Froelich would have been foolish to

proceed in the absence of adequate preparation. Obviously, the day and a half recess was beneficial because Froelich gave a lengthy opening statement and presented several defense witnesses during the defense's case-in-chief. There is no showing that the delay requested by Froelich prejudiced the outcome of the trial.

### 8. Failure to Properly Question Witnesses

Flamenco claims that Froelich provided ineffective assistance when he impermissibly led and directed the testimony of witnesses. The main challenge is to the examination of Sandra Flamenco. As set out above, despite persistent efforts, Froelich was unable to elicit from Sandra that DEA agent Roberts said that "black people" would rape Flamenco in prison, although she did say her father would be "screwed." The district court called an *in camera* hearing and warned Froelich he would not be allowed to lead Sandra. During an attempt out of the presence of the jury to have Sandra say the words "black people," Froelich whispered the words to her which were overheard by the judge. Sandra was not recalled before the jury and Froelich said in closing remarks that he made a mistake in calling her first and did not get the testimony from her that he might have gotten at another time.

Certainly, Froelich was too focused on Sandra saying "black people" and went too far in attempting to elicit this testimony. Sandra had already said that Roberts called her father names and told her that her father would be sexually assaulted in jail and Froelich knew that other relatives would testify to the "black people" language. In hindsight, the best course of action would have been to let her testimony stand without badgering her for the "black people" remark and not apologize for calling her as a witness. However, Froelich had obviously gone over Sandra's testimony with her prior to trial and expected she would be a strong witness for the defense, which led to his overreaction when she did not testify as expected. In any event, Froelich's performance in

questioning Sandra does not amount to ineffective assistance of counsel because even if he had handled her testimony in a different manner, this would not have changed the outcome of the trial.

Flamenco cites another instance in which Froelich asked leading questions of Elias Cabrera-Resino, a co-worker of Flamenco's, to try to get him to speak of a "grudge" Gutierrez had against Flamenco. When the court cautioned Froelich about asking leading questions, he told the court he needed a recess before he could finish the witness. After the recess, Cabrera-Resino spoke freely of the "grudge" and the prosecutor in cross-examination pointed out that the witness seemed to change stories after the break. Here, when the witness did not testify as expected, Froelich's pressing for the important expected response to the question and then asking for a recess appear to be reasonable reactions to a recalcitrant witness problem. Moreover, Froelich's questioning of the witness did not adversely affect the outcome of the trial.

*Blakely*

For his final claim, Flamenco challenges his sentence based on *Blakely v. Washington*, _____U.S._____, 124 S.Ct. 2531 (2004), which was announced on June 24, 2004. In that case, the Supreme Court struck down as unconstitutional a Washington state sentencing scheme that allowed judges to apply sentencing enhancements based on judge-found facts. The Court held that the Sixth Amendment right to trial by jury requires that any fact which leads to a sentencing enhancement other than the fact of a prior conviction, must be found by a jury or admitted by the defendant. In *United States v. Booker*, _____U.S._____, 125 S.Ct. 738 (2005), delivered on January 12, 2005, the Supreme Court applied the *Blakely* holding to the mandatory Federal Sentencing Guidelines, finding them unconstitutional. The Court made the Guidelines advisory only.

Here, Flamenco's conviction became final on appeal prior to delivery of the *Blakely/Booker* decisions. The Eight Circuit has held that *Booker* is not retroactively applied to convictions that became final prior to issuance of the decision. *Never Misses a Shot v. United States*, 413 F.3d 781 (8th Cir. 2005). It follows, since *Booker* is an extension of *Blakely*, that *Blakely* is not retroactively applied. *See id.; United States v. Stoltz*, 149 Fed.Appx. 567 (8th Cir. 2005)(unpublished)(every circuit court to consider issue has held *Blakely* not retroactively applied).

CONCLUSION

Based on the above, I recommend that Flamenco's § 2255 motion be denied and dismissed with prejudice. **The parties have ten (10) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

DATED this 31st day of January 2006.

/s/Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE